Okay, please look forward. Atiria Clark on behalf of the petitioners. Would you state your name again? Atiria Clark. Okay. Petitioners contend that the board and the immigration judge erred on three main issues. The first issue being that the court erred in making a negative credibility finding based on minor inconsistencies in the lead petitioner and female petitioner's testimony in their affidavits. Particularly with regard to the lead petitioner, the court found three areas that they believe the lead petitioner provided inconsistent testimony which they based their adverse credibility ruling upon. With regard to the first instance, the immigration judge determined that the lead petitioner failed to identify the name of his minority rights group of which he was a member. That was clearly contrary to the record. On page 139 of the certified administrative record, the lead petitioner identifies his minority rights group as the Association of Small Nations. Apparently there was some... It wasn't clear that that was the name of the group. It was like just an association of minority groups. Correct. I believe he stated that once there was some discussion about the legal name, I believe he did clarify that that was in fact the name of the group. I believe on page 136 of the certified record. Go ahead. Pages 136 and 139. Go ahead. Did you want me to? No. With regard to the second point of the inconsistent testimony, the immigration judge determined that the lead petitioner's failure to speak about the person, the leader of his organization, his failure to name him in his affidavit, constituted some kind of inconsistency to support an adverse credibility finding. However, the lead petitioner provided a rational basis for why he omitted that person's name from his affidavit. He stated that he believed that the affidavit was meant to be general information about his experiences, and he anticipated on providing more details at his testimony. Again, this is another... An oversight on the lead petitioner's part to include that person's name in his affidavit. With regard to the third instance, the immigration judge determined that there was an inconsistency about the testimony regarding the size of the protest where the lead petitioner was arrested. And under Chen v. Ashcroft, minor discrepancies or omissions that do not go to the heart of the asylum claim cannot constitute substantial evidence to support an adverse credibility finding. And... Correct. Again, I would argue that that doesn't go to the heart of the asylum claim, and that the immigration judge didn't take into account the numerous details that he provided regarding his abuse while he was detained, his treatment as a child because of his ethnicity, and his treatment in the military as a result of his ethnicity. He provided consistent testimony with regard to those. There was one other point that caught my eye that the I.J. relied upon, and that was that he testified that he was released the same day as his arrest on May 1, but in his declaration he stated that he was detained for three days. Did you catch that? I did catch that, Your Honor, and I don't believe that he had a reason for that discrepancy. I can't provide argument regarding that situation. Well, I guess if you go to the record, you read the record very careful, it looks like he testified that he was actually in the cell for three days. Correct. How about his co-petitioner? With regard to the female petitioner, the immigration judge also made an adverse credibility finding determination on her testimony, primarily because one of the issues dealt with her failing to seek medical attention after she was raped, and because she failed to seek medical attention after being raped, the immigration judge concluded that she must have not been raped. Again, that goes against the substantial evidence presented in the record. The female petitioner testified that she attempted to seek medical help when she was physically attacked and had suffered two broken ribs, and after three days she never did receive that medical attention. She was then incarcerated and raped by two guards, two officers in the detention facility, and being that that had led to a traumatic incident, she testified that her only concern at that point was to get out of the Ukraine. She did, in fact, attempt to seek medical attention in the detention facility, but they did not provide that medical assistance to her, and she did four days later come to the United States and made it a point to get here, and her focus at that point was just to get out of Ukraine. With regard to the other incident of the female petitioner's inconsistent testimony, the immigration found that there was a discrepancy of the bed rest that the female petitioner endured as a result of her attack, where she suffered two broken ribs, and again, I would say inconsistencies that don't go to the heart of the asylum claim. She did clarify that discrepancy by stating that she was in bad condition for about seven days, but she was at home for a period of about 14 days. She, I believe there was a medical report that was presented that stated that she was to be on bed rest for 14 days, and she did testify that she was on bed rest for about seven days, but she was on bed, was in the home for 14 days. It was just a discrepancy between what she meant as bed rest and what she meant as being physically unable to carry about, so that was reconciled. And with regard to the other issues that the petitioners present, the petitioners, give me one moment. The petitioners assert that their due process rights were violated on two instances by the immigration judge and the board. The first instance, the petitioner's due process rights were violated because the court failed to provide the petitioners with a coherent translator. There's over 188 incidents in the record that show that there were problems with the translation. The judge was not happy with the translator, which he was reprimanded by the court for trying to explain that the translation was inaccurate, and this situation created a position that resulted in the petitioners being deprived the opportunity to have a fair, a fundamentally fair hearing in violation of the due process clause. The second point, the due process, the petitioners' due process rights were violated again when the immigration court denied their request to allow live testimony by one of their expert witnesses. They believe this expert could provide detailed testimony regarding their historical, to put their testimony into a historical and cultural context, and that would have been able to boost or give the court an understanding as to the context of their testimony, and perhaps the context of the demeanor of the petitioner. I noted that the immigration judge stated that he showed no emotion when his wife was testifying about her rape, and perhaps the expert witness could have provided testimony to clarify the reason. His declaration was submitted, though, wasn't it? Yes, the declaration was submitted, Your Honor. And again, by not being able to present their expert witness, the petitioners were deprived their right to present evidence on their own behalf. And you're almost out of time. Would you like to save some time for a rebuttal? Yes, can I save about a minute or two? You've got about one minute, 11 seconds. Okay, thank you. May it please the Court, Christina Periscindola for the Attorney General. In this case, the immigration judge's adverse credibility finding also was supported by several grounds that went to the heart of both petitioners' claims. And this Court is bound by an adverse credibility finding, even if some of the grounds that the immigration judge identified were irrelevant or were not supported by the record. And in this case, also, the immigration judge gave both petitioners a chance to explain the inconsistencies between their testimony and their declarations, and the judge considered their explanations. I'll start out with Mr. Kallis. He said, well, they let me go on the same day as the rally. And then in his written declaration, he stated that he was detained for three days. And at his immigration court hearing, when asked about this discrepancy, he said, well, as far as I remember, they let me go on the same day. The second inconsistency was his... Let me see. When I looked at that, 167, 166 and 167, he's talking about being in the cell. Okay. All right. On 166, in the cell, there was one more person. I did not know him. And then he goes on. And then he says, did you answer their question? Yes. What happened to you next? The next day, they didn't call anyone. And in the third day, they came for me again, which suggests to me that what happened to me was that they didn't call anyone. And the way I read it, they took me again into the office. Again, there were those two investigators. And they said, okay. And then it goes on. I went to read. Oh, let's see. Sometimes this is hard to follow. There was something written not appropriate, something that I didn't. But as I read that, it says that he was in there for three days. Yes, Your Honor. I would take that to mean the same thing, too. So how is that inconsistent with what he testified? Well, we're not sure that he is referring to the same event that I'm describing. Is this the May 1st, 1997? Yes. Right. But later on, if you look when he's cross-examined on page 225. Okay. Hold on. What page? 225. Okay. I got it. And he said, well, I was released on the same day. So maybe he's contradicting himself internally the same day. Hold on. Hold on. Which line is that at? Okay. Line 12 through 14. So in the police station, they took our documents and kept us until the evening hour without asking us anything. No questions were asked. They simply freed us, let us go. Now, how do we know that that's referring to the May 1 event? I think if on page 223, line 9 and line 11, that's referring to the May 1 event. Okay. And then line 10, when Mr. Callis' attorney asks him, did you participate in a human rights meeting on May 1, 1997? Okay. Well, I'll take another look at this. Okay. But that's what you rely on. Yes. Yes, Your Honor. The second inconsistency was the fact that his organization, which he referred to in his declaration by the Russian word for revival, in his testimony had no name. And when asked about this, he said, well, it's an organization. It didn't have a name. Or, you know, I guess he assigned it one at his hearing, said, well, it was the Association of Small Nations. But he referred to it as kind of a common noun, not a proper noun. The third discrepancy is that he... And let's see... It was an Association of Small National Groups. Judged to Mr. Callis, that was the name of the organization. It was simply an association that had no name. This is probably on page 137 of your... 138. Okay. 138. Okay. So what was... I'm looking at lines 14 and 15. What was the name? Line 15 says it was an Association of Small Nations. Right. And you keep going. And to clarify, line 22, it was simply an association that had no name. Now, before that, it says it was an Association of Small National Groups. That was the name of the organization. It was simply an association that had no name. It was an Association of Small National Groups. So that contradicted Mr. Callis's declaration that he was in this group called whatever... He could have been in a number of groups, right? That's possible. And that is entirely a possibility that I haven't considered. However, the immigration, the record here doesn't compel a finding contrary to the immigration judges. And there was certainly plenty of opportunity for Mr. Callis to clarify that. You know, I belonged to several organizations, and, you know, there's... they had different names. But this never came out. And he appeared before the immigration judge, I think, about ten times. And, you know, that... Yeah. One of the things that's not clear to me from the parts of the record that I've looked at is what part did the language problem play in the credibility finding? Well, Your Honor... What language did they use in the... What language was the Petitioner using in his... The Petitioner was speaking in Russian, and there was a Russian translator. And the Petitioner points out that there were some occasions where the translation was indiscernible. But none of... And also the Petitioner has identified several issues with the translation. For example, I think at one point the Russian word was machina, and that can mean machine, or it can mean automobile. But none of them were material to either of the Petitioner's claims. Well, that was the one... What I was wondering is, in the due process part of the brief, they were claiming a lack of due process because of translation errors. Now, is Ukrainian and Russian, they're dialects in some of those Slavic languages, that they aren't all the same? Your Honor, I'm not really qualified to speak to that, but I can tell you that the Petitioner's requested translation in Russian, and they both stated that that is their... The language in which they're fluent. The female was Latvian or something, wasn't she? She was born in Latvia, but there's a point in her testimony where she testifies that she does not speak Latvian. Well, I just wondered about the connection between the credibility problem and the other, the translation problem, which may have been a discrete problem in separate cases. Yes, Your Honor, and I would say, just looking through the record, that this interpreter, at least at the February 10, 2003 hearing, was diligent, and in many occasions actually stopped and said, let me clarify, you know, there's no direct translation for the term, you know, felt cloth boot in the English language. But I think he made an effort to make sure everything was translated correctly. How about the female? Well, I saw two major inconsistencies that went to the heart of her claim. First of all, she claimed that she was raped, and that resulted in internal bleeding. She testified that someone saw her after this happened, and that she was bleeding, so obviously there must have been a lot of blood. And she was asked, well, did you seek medical treatment? And she did testify, as petitioner's counsels pointed out, that she sought medical treatment in the jail and did not receive that. But when she walked out, or I guess she was on the street, somebody saw her, and, you know, she did not seek medical treatment in the Ukraine, saying, well, I wouldn't have been able to get it. And then she arrived in the United States three or four days later, and she was asked, did you seek medical treatment? And she said, no, I didn't have insurance. And this definitely goes to the heart of her claim, where she's saying, you know, I suffered this brutal rape, and then I didn't seek medical treatment. I understand that there is a case that came out last year by this court saying that, you know, an asylum applicant's not seeking medical treatment is not, it seemed quite none of whether they're credible or not. But in this case, where Mrs. Callis is saying this was such a horrible thing that happened, and, you know, I was bleeding, I think if anyone was suffering bleeding that way, no matter what the cause was, it would be reasonable to expect that person to seek medical treatment. And, again, you know... We don't know. She was just asked, did you seek medical treatment? I couldn't really speak to that. It wasn't something that was developed in the record. But that's the inference that the IJ inferred, that she could have gotten medical treatment. Even if she, but the issue is here, actually, she did not seek medical treatment. It is possible that it was not available, but she said, you know, it wouldn't have been provided to me, or I think she said, I was just focused on getting out of this country. And she did that. You know, she made it here. She had the resources. She had the wherewithal to do that. And yet she did not seek medical treatment in the United States. Also, the second thing was that she claimed that she needed seven days bed rest following the attack that she suffered on April 20, 1997. But then she submitted a document that looked to be a medical report stating that she needed 14 days treatment. And her explanation for the discrepancy was that she simply needed this as an excuse to get out of work. But then she also testified that, let me make clear that this document really proves the medical condition I was in. So she's asking the immigration judge to consider this as this, to the seriousness of her medical condition. Yet then she completely contradicts herself. So those were two major inconsistencies that went to the heart of her claim of being persecuted. And as far as the due process arguments that the Cowles' counsel has raised, and we've already spoken to the translation, as far as having their expert, Dr. Cotler, testify, there are several occasions here I think the immigration judge granted the petitioner's three or four continuances to have his testimony on record. And in the end, when they weren't able to provide him, and after both the Cowles' were examined and cross-examined, it was determined they weren't credible. And even their attorney said, well, Dr. Cotler did not know either petitioner in the Ukraine and couldn't speak to their experiences personally. So there's no need to reach having Dr. Cotler testify. And his declaration was admitted into the record. So if there are no further questions, we thank you for your time. And again, if the court decides that the record compels a contrary conclusion, the case should be remanded for further findings. Thank you. Give that a minute. I'd like to just point the court's attention to pages 136 to 139 of the record. I'm sorry, 137 to 139 of the record, concerning the name of the organization. And I'll just read this very quickly. I participated in an organization which wanted to unite all national minorities such as charters. Okay, let me just get to page 138. Line 14, what was the name of the organization? It was Association of Small Nations. Your Honor, may the interpreter clarify the term? No audible response. It was an association of small national groups. That was the name of the organization. It was simply an association that had no name. Did you register the group? No, I didn't register any group. 139, was it registered in the Ukraine? I think that yes. So it was registered even though it didn't have a name, is that right? I think yes, that it was simply registered as an association without a name. Association of Small Nations, that was its name. I think the petitioner was quite clear that that was the name of the association. And in this dialogue it shows the problem with the translator. Apparently there was miscommunication and mistranslation in this scenario that caused the immigration judge to lead to that adverse credibility ruling. But the petitioner clearly states that the name was Association of Small Nations. With regard to the other issue, as far as the way petitioners stay in the jail, on May 1st he did testify at first that he was there for three days and then it appears from the record on page... Okay, your time is just about up, so make your last point. I lost the page, but it appears he said that they were detained again, implying that there was a second occasion during that time period where he was detained. Okay, thank you. Appreciate your arguments, the matter is submitted. We're in recess, adjourned until tomorrow.
judges: Goodwin, Beezer, Paez